# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MARSULEX ENVIRONMENTAL    :    CIVIL NO.: 1:15-CV-00269
TECHNOLOGIES,    :
   :
            Plaintiff,    :
         v.    :    (Magistrate Judge Schwab)
   :
SELIP S.P.A.,    :
   :
   :
            Defendant.    :

## <u>MEMORANDUM</u>
March 18, 2016

## I. Introduction.

Plaintiff Marsulex Environmental Technologies ("MET"), a Delaware Corporation with its principal place of business in Lebanon, Pennsylvania, brings this diversity action for strict liability, breach of contract, breach of express warranty, breach of implied warranty, and unjust enrichment against Defendant Selip S.P.A. ("Selip"), an Italian corporation with its principal place of business in Fontanellato (Parma), Italy, based on Selip's alleged deficient design and manufacturing of the external fiberglass reinforced recycle piping ("FRP piping") that was supplied to one of MET's customers in Poland. Selip has moved to dismiss MET's complaint under the doctrine of *forum non conveniens*, insisting

that this action cannot proceed fairly in the Middle District of Pennsylvania, and that instead it should be litigated in Poland. *Doc. 6*. In the alternative, however, Selip has moved under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Count I of the complaint—strict liability. *Id.* The parties have fully briefed Selip's motion, and they have also participated in oral argument, *see doc. 26*. After a thorough consideration of the parties' briefing and their respective arguments, we will deny Selip's motion on *forum non conveniens* grounds; we will, however, grant Selip's motion under Rule 12(b)(6) to dismiss Count I of the complaint.

## II. Statement of Facts.[1]

On or about January 22, 2010, MET, a company which provides air quality control systems to minimize the emission of air pollutants, entered into an engineering and procurement agreement with Zaklady Azotowe "Pulawy" S.A. ("ZAP"), a chemical company in Poland, which specializes in the manufacturing of fertilizer. *Doc. 1* at ¶¶ 8, 9. This agreement, in part, required MET to oversee the design and purchase of goods for the construction of a Flue Gas Desulfurization Unit ("FGD Unit") at ZAP's chemical plant in Poland. *Id.* at ¶ 10. According to

---

[1] In accordance with the standard of review for a Rule 12(b)(6) motion, we will not only "accept all factual allegations in the complaint as true," but we will also "construe the complaint in the light favorable to the plaintiff[.]" *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010).

MET, the environment inside an FGD Unit is highly corrosive, and based on past experience, MET determined that the FGD Unit required FRP piping.  *Id.* at ¶ 11.

On or about June 21, 2010, MET entered into a contract with Selip, under which Selip agreed to design, manufacture, and supply FRP piping for the construction of the FGD Unit at ZAP's chemical plant.  *Id.* at ¶ 12.  This contract required Selip to, among other things,  fabricate the FRP piping in accordance with Selip's recommended procedures and approved drawings.  *Id.* at ¶ 13.  This contract further required the inner and outer surfaces of the FRP piping to be "free of cracks."  *Id.* at ¶ 14 (quoting *doc. 1-2* at 9, ¶ 4.4).  In addition, Selip warranted that the contracted for equipment would be "properly and professionally constructed;" it would "meet the technical requirements of the Purchase Order[,] including the standards and regulations[,] as well as the best engineering practices;" and it would be "new and unused, of the specified material, free of defects, and fit for the application specified."  *Id.* at ¶ 15 (quoting *doc. 1-3* at 3, ¶ 5).  Selip further warranted that the FRP piping would be "of merchantable quality, free from all defects in design, workmanship and materials, and . . . fit for the particular purposes for which they are purchased," and finally, "provided in strict accordance with the specification, samples, drawings, designs or other requirements (including performance specification) approved or adopted by [MET]."  *Id.* at ¶ 16 (quoting *doc. 1-4* at 4, ¶ 10 (b)).

3

On or about February 3, 2011, Selip delivered the FRP piping to ZAP's plant, and in October of 2012, the plant began operating. *Id.* at ¶¶ 17, 18. Only a few months later in January of 2013, Selip was notified that there were cracks in the FRP piping. *Id.* at ¶ 19. Selip, after examining the FRP piping at ZAP's plant, acknowledged the cracks, but deemed the cracks "superficial" and filled them with resin. *Id.* According to MET, these cracks were an early warning sign that Selip's FRP piping was defective, and as later revealed, Selip's hasty patch-up failed to repair the piping. *Id.*

On or about September 16, 2013, Selip was notified that new cracks were forming in the FRP piping. *Id.* at ¶ 20. Selip, on or about April 8, 2014, went to ZAP's plant, examined the cracking in the FRP piping, acknowledged that there were cracks in the piping, and avowed that it would provide support and assistance to repair the cracks. *Id.* at ¶ 21. According to the complaint, Selip, contrary to the parties' agreement, specified that all costs to repair its defective piping would be charged to either MET or ZAP. *Id.* at ¶ 21.

On or about May 31, 2014, there was a serious malfunction at the FGD Unit due to the allegedly defective FRP Piping. *Id.* at ¶ 22. ZAP, on June 2, 2014, informed MET of this failure, and MET, on the same day, informed Selip of the same. *Id.* The following day, MET sent Selip photographs of the failed FRP piping and resulting damage at ZAP. *Id.* at ¶ 23. According to MET, the

photographs illustrate that the FRP piping essentially exploded and tore apart, causing structural damage to ZAP's pumping station facility.  *Id.*  Thereafter, MET informed Selip of ZAP's understanding that the failure was caused by a deficiency in Selip's design and manufacturing of the FRP piping, and MET requested that Selip dispatch someone to ZAP in order to examine the piping and make a determination as to why it failed.  *Id.* at ¶ 24.  According to MET, however, Selip refused to send someone.  *Id.* at ¶ 25.

As a result of the failed FRP piping, ZAP's plant was completely shut down for approximately three months.  *Id.* at ¶ 26.  In order to repair the FGD Unit, MET was forced to replace, at MET's expense, Selip's failed FRP piping with piping from another manufacturer.  *Id.* at ¶ 27.  MET also hired a third party expert (the "Expert") to investigate the failed FRP piping.  *Id.* at ¶ 28. The Expert evaluated cross-sections from samples of the piping, as well as the piping's construction *via* "visual inspection and a modified loss on ignition test—also referred to as a burn test."  *Id.* at ¶ 29.  The Expert concluded that the FRP piping supplied by Selip was poorly constructed because Selip used low strength reinforcement and non-structural components in the flange area of the piping.  *Id.* at ¶ 30.  The Expert further concluded that the flanges in the piping did not meet Selip's design and fabrication requirements.  *Id.*  In particular, the Expert's tests revealed that the woven roving layers that were required by Selip's working procedures were not

used in the flange section of the FRP piping, thus resulting in weak piping, which could not handle the stress that it was intended to handle.   *Id.* at ¶ 31.   The Expert's tests further revealed that the FRP piping included "flange areas that had joints and were not made essentially from one piece as depicted in Selip's drawings and working procedures." *Id.* at ¶ 32. "Selip's use of flanges with joints reduced the overall flange strength because a joint crevice was located directly behind the point of high stress in the flange hub." *Id.* Finally, the testing showed instances of poor secondary bonding. *Id.* at ¶ 33.

On or about September 24, 2014, MET informed Selip that there were manufacturing defects in the FRP piping, and further, that the piping was not manufactured in accordance with the parties' contract, Selip's working procedures, or Selip's design.   *Id.* at ¶ 34.   Moreover, Selip failed to manufacture sections of the piping's flange areas in conformity with the standard industry practice because "Selip prepared the piping's flanges with a non-structural short segment of pipe placed behind the flange extending the length of the elbow rather than laying-up the flange directly onto the end of the elbow." *Id.* at ¶ 35.   As a result, Selip's FRP piping was not fit for its intended use.   *Id.*

Based on the foregoing, MET requested payment from Selip in the amount of $557,873.53 for "the replacement pipes and other services MET was forced to

6

render" as a result of Selip's defective FRP piping. *Id.* at ¶ 36. According to the complaint, Selip rejected this request. *Id.* at ¶ 37.

## III. Discussion.

### A. Selip's Motion Under the *Forum Non Conveniens* Doctrine.

In considering Selip's *forum non conveniens* motion, we "must first determine whether an adequate alternate forum can entertain the case," and if so, we must next determine "the appropriate amount of deference to be given [MET's] choice of forum." *Eurofins Pharma US Holdings v. BioAlliance Pharma SA*, 623 F.3d 147, 160 (3d Cir. 2010) (internal quotation marks omitted) (quoting *Windt v. Qwest Comms. Int'l, Inc.*, 529 F.3d 183, 189-90 (3d Cir. 2008)). After determining the appropriate amount of deference that is to be given to MET's choice of forum, we "must [then] balance the relevant public and private interest factors." *Eurofins*, 623 F.3d at 160; *see also Windt*, 529 F.3d at 189 (articulating that the private interest factors affect the convenience of the litigants, whereas, the public interest factors affect the convenience of the forum). "If the balance of these factors indicates that trial in the chosen forum would result in oppression or vexation to [Selip] out of all proportion to [MET's] convenience," we have the discretion to "dismiss the case on *forum non conveniens* grounds." *Windt*, 529 F.3d at 190. Selip bears the burden of persuasion as to "all elements of the *forum non conveniens* analysis." *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 180 (3d Cir.

1991) ("*Lacey II*") (alteration in original) (quoting *Lacey v. Cessna Aircraft Co.*, 862 F.2d 38, 43-44 (3d Cir. 1988) ("*Lacey I*")).

### 1. Adequate Alternate Forum.

Turning first, as we are required, to the determination of whether an adequate alternate forum exists, we find that Selip has met its burden. "As the Supreme Court stated in *Piper*, [o]rdinarily, this requirement will be satisfied when the defendant is amenable to process in the other jurisdiction, except in the rare circumstances . . . where the remedy offered by the other forum is clearly unsatisfactory, such as when the alternative forum does not permit litigation of the subject matter of the dispute." *Lony v. E.I. Du Pont de Nemours & Co.*, 886 F.2d 628, 633 (3d Cir. 1989) ("*Lony I*") (internal quotation marks omitted) (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 n.22 (1981)). Selip avers its amenability and submission to the jurisdiction of the Polish courts, as well as the cognoscibility of MET's claims in the same. *Doc. 7* at 11. In support, Selip submits the declaration of Carlo Romani, the chief executive officer of Selip, who confirms that Selip will submit to the jurisdiction of the Polish courts and that counsel of record will accept service of process on the company's behalf. *See doc. 8-1* at 2. Selip also submits the declaration of Arkadiusz Korzeniewski ("Korzeniewski"), an attorney and partner of a litigation department with a law firm in Warsaw Poland, who confirms that Poland has a sophisticated judicial

8

system—similar to that of the United States—and that Polish law provides a cause of action for MET's claims.  *See doc. 8*-2 at 2, 4-7.  MET has not contested that Polish law provides an adequate forum for their claims.  Thus, Selip has satisfied the first element of the *forum non conveniens* analysis since Poland constitutes an adequate alternate forum for this litigation.

### 2. Amount of Deference.

Having determined that an adequate alternate forum does exist in Poland, we must next determine the degree of deference that is to be given MET's choice of forum—i.e., the Middle District of Pennsylvania.  "Ordinarily, a strong presumption of convenience exists in favor of a domestic plaintiff's chosen forum, and this presumption may be overcome only when the balance of the public and private interests clearly favors an alternate forum."  *Kisano Trade & Invest Ltd. v. Lemster*, 737 F.3d 869, 873 (3d Cir. 2013).  Selip acknowledges that a "strong presumption" does exist in favor of a plaintiff's chosen forum, and further, that a plaintiff deserves more deference when she has brought an action in her home forum, but nevertheless avers that MET's choice of forum should be accorded diminished deference since the operative facts giving rise to the complaint occurred outside of the United States. *Doc. 7* at 12-13.  In response, MET argues that as a United States Corporation and citizen of the Middle District of Pennsylvania, its choice of forum is entitled to substantial deference. *Doc. 10* at 5.

While MET's choice of forum is not entitled to dispositive deference, *see Piper*, 454 U.S. at 255 n.23, our analysis leads us to conclude that MET's choice of forum is nevertheless entitled to great deference.  It is settled that "a plaintiff's choice of forum is entitled to greater deference when the plaintiff has chosen the home forum."  *Id.* at 255 (citing *Koster v. (American) Lumbermens Mut. Casualty Co.*, 330 U.S. 518, 524 (1947)).  It is further settled that "[w]hen the home forum has been chosen, it is reasonable to assume that this choice is convenient."  *Id.* at 255-56.  MET has chosen to bring suit in its home forum, the Middle District of Pennsylvania, against a foreign defendant, Selip.  Thus, although it is reasonable for us to assume that MET's choice is based on convenience, we also believe MET's allegations support such an assumption.  *See generally doc. 10* (explaining that MET's corporate headquarters are located in Pennsylvania, most of the evidence and witnesses it needs to establish liability are located in the United States and Italy—not Poland, and that Pennsylvania law governs this dispute).  Accordingly, MET's choice of forum is entitled to great deference.

### 3. Oppression or Vexation.

Since we have determined that MET's choice of forum is entitled to great deference, we now turn to whether Selip has shown that "the private and public interest factors weigh heavily on the side of dismissal."  *Lony v. E.I. Du Pont de*

Nemours & Co., 935 F.2d 604, 609 (3d Cir. 1991) ("*Lony II*") (quoting *Lacey I*, 862 F.2d at 44).

### a. Private Interest Factors.

The private interest factors include: (1) "the relative ease of access to sources of proof"; (2) the ability to compel the attendance of unwilling witnesses, and the cost of obtaining the attendance of willing witnesses; (3) the possibility of viewing the premises, if such view would be appropriate; (4) and "all other practical problems" that would make trial of the "case easy, expeditious, and inexpensive." *Windt*, 529 F.3d at 189 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).

The first relevant factor, which requires us to address the ease of access to sources of proof, does not support dismissal.  Expectedly, Selip maintains that all relevant evidence is located in Poland, where the piping malfunctioned, and MET maintains that all relevant evidence is located in Pennsylvania and/or Italy, where the contract was negotiated and where the piping was manufactured.  MET has submitted the declaration of Mary Lynn Devine ("Devine"), the Procurement Director at MET, who confirms that after the FRP piping failed on or about May 31, 2014, it was removed from ZAP as waste, and as a result, the only remaining samples are now located in the United States.  *Doc. 10-2* at 3, ¶¶ 1, 6.  Devine further confirms that there would be no evidence of any modifications made to the

FRP piping because the entire unit[2] needed to be replaced as a result of the significant damage that was caused by the allegedly defective piping. *Id.* at ¶ 7. Although Selip has submitted the affidavit of Arkadiusz Korzeniewski (*doc. 8-2*), we give this affidavit little weight.  It appears that this lawyer was retained by Selip in order to explain the contours of Polish law, but it does not appear that this lawyer has or had a personal relationship with Selip, nor does it appear that this lawyer has personal knowledge of the location of the relevant evidence.  Further, we find that the bullet-point paragraphs in the affidavit, which generally assert that all documentary and physical evidence that Selip seeks to maintain is located in Poland, merely paraphrase the arguments already asserted by Selip in its brief in support of its motion to dismiss.  *See id.* at 7.  Thus, the first relevant factor does not support dismissal.

Similarly, the second relevant factor, which requires us to consider the availability of compelling the attendance of unwilling witnesses, as well as the cost of obtaining the attendance of willing witnesses, also does not support dismissal. While we remain cognizant of the United States Court of the Appeals for the Third Circuit's admonition that "[t]he Supreme Court has rejected the suggestion that 'defendants seeking *forum non conveniens* dismissal must submit affidavits

---

[2] It is unclear to what "unit" Devine is referring, but based on the context of her declaration, we presume she is referring to the FGD Unit. *See doc. 10-2* at 3, ¶¶ 5-7.

identifying the witnesses they would call and the testimony these [witnesses] would provide if the trial were held in the alternative forum[,]'" we also firmly understand that "the defendant 'must provide enough information to enable the District Court to balance the parties' interests.'" *Delta Air Lines, Inc. v. Chimet, S.p.A.*, 619 F.3d 288, 299-300 (3d Cir. 2010) (quoting *Piper*, 454 U.S. at 258). Selip, however, has not provided the requisite information to permit a balancing analysis.  In particular, Selip has not identified any specific witness or any specific number of witnesses.  *See, e.g.*, *Kisano*, 737 F.3d at 878 (explaining that defendant, who moved to dismiss plaintiff's amended complaint on *forum non conveniens* grounds, had identified nearly twenty witnesses located in Israel, the country of residence of both plaintiff and defendant, as opposed to plaintiff, who identified only several witnesses located in the United States).  Nor has Selip proffered the information that is expected to be obtained from these purported witnesses.  *See, e.g.*, *Delta Air*, 619 F.3d at 300 (concluding that defendant provided enough information when defendant identified the witnesses it intended to depose and proffered in oral argument the information that it expected to obtain from those witnesses).  Thus, the second relevant factor does not support dismissal.

Likewise, the third relevant factor, which requires us to address the possibility of viewing the premises if such view would be appropriate to the action, also does not support dismissal.  Selip has not bolstered its general averments that

any of the FRP piping actually remains at ZAP's chemical plant. *See doc. 7* at 19.

MET, on the other hand, has submitted the declaration of Devine, the Procurement

Director at MET, who confirms that the FRP piping was removed from ZAP's

plant in Poland and that the only remaining samples are now located in the United

States. *Doc. 10-2* at 3, ¶¶ 5-7. Furthermore, neither party is precluded from

submitting photographic or videotaped evidence of ZAP's plant. Thus, we find

that the third relevant factor does not support dismissal.

Finally, the fourth relevant factor, which requires us to consider all other

practical problems associated with this litigation, does not support dismissal. Selip

avers that dismissal is warranted because it would be unable to implead ZAP,

which, according to Selip, is a necessary party to this litigation. *Doc. 7* at 17. Yet,

Selip has presented no evidence to support that averment. Moreover, although the

inability to implead other potentially responsible third-parties generally supports

dismissal for purposes of a *forum non conveniens* analysis, *Piper*, 454 U.S. at

259, we find that, in this case, it is only one factor warranting dismissal. We

cannot find, however, that this one factor heavily outweighs the other private and

public interest factors, which otherwise favor keeping this action in the United

States. *See Incubadora Mexicana, SA de CV v. Zoetis, Inc.*, 116 F. Supp. 3d 519,

528 (E.D. Pa. 2015) (recognizing that "the inability to implead other potentially

responsible third-party tortfeasors does traditionally support dismissal" under the

14

doctrine of *forum non conveniens*, but ultimately concluding that the defendants' inability to implead third-parties did not warrant dismissal because such inability did not outweigh the other balancing factors).

To conclude, we find that the private interest factors weigh in favor of MET.

### b. Public Interest Factors.

The public interest factors include: (1) the "administrative difficulties flowing from court congestion"; (2) the local interest in having the case tried at home; (3) "the interest in 'having the trial of a diversity case in a forum that is at home with the state law that must govern the case'"; (4) avoiding "unnecessary problems in conflict of laws, or in the application of foreign law"; and (5) "the unfairness of burdening citizens in an unrelated forum with jury duty." *Windt*, 529 F.3d at 189. Selip argues that litigating this case in Pennsylvania will increase this Court's congestion, present unnecessary administrative difficulties since, according to Selip, the operative facts giving rise to this action occurred in Poland, burden the citizens of Pennsylvania with a case that has no impact on their community, and finally, this case will be litigated in an unrelated forum should it be tried here in Pennsylvania. *Doc. 7* at 20-23. On the other hand, MET opposes Selip's argument, addressing each factor, and maintains that the public interest factors do not weigh heavily on the side of dismissal. For the following reasons, we agree

with MET and conclude that the public interest factors favor keeping this action in Pennsylvania.

The first relevant factor, which requires us to consider the administrative difficulties flowing from court congestion, does not support dismissal.  Without having to determine the relative congestion of Pennsylvania and Polish courts, we conclude that the parties' instant action can be adjudicated here, in this Court, without undue administrative difficulties.  To the extent that Selip asserts otherwise, Selip has done so in conclusory fashion and has presented no basis for its assertion.  Thus, the first relevant factor does not support dismissal.

As to the second relevant factor, however, we conclude that each forum has a similar interest in resolving this litigation.  Pennsylvania has an interest in providing its citizens with a remedy when they are harmed through the sale of a deficiently designed and manufactured product, and Poland has a similar interest when a deficiently designed and manufactured product malfunctions in its facilities.  Thus, because this factor is neutral, we cannot conclude it warrants dismissal.

The third and fourth relevant factors, which reflect the desire to avoid unnecessary problems in conflict of laws and in the application of foreign law, as well as the desire to have localized controversies decided in a forum that is at home with the law that must govern the action, do not support dismissal.  Pursuant to a

choice of law provision in the parties' purchase order, Pennsylvania law governs this litigation.  Specifically, the Purchase Order states, in pertinent part, as follows: "Vendor to provide External Recycle Piping in accordance with the Purchase Order Scope of Work document dated 6/21/2010 which is incorporated in and made part of this order." *Doc. 10-8* at 2.   And, the Purchase Order Scope of Work states that "[t]he Purchase Order will be governed and construed in accordance with the laws of the Commonwealth of Pennsylvania, U.S.A." *Doc. 10-2* at 7, ¶ 8. Selip has not addressed this provision, however, and in the absence of persuading us otherwise, we will respect the choice of law that the parties have previously agreed upon to resolve their private dispute.  Thus, this diversity action is currently in a forum that is at home with the state law governing it.  *Windt*, 529 F.3d at 189. Accordingly, the third and fourth relevant factors do not support dismissal.

Finally, as to the fifth relevant factor, which requires us to address the unfairness of burdening citizens in an unrelated forum with jury duty, we conclude that this factor also does not support dismissal.  MET, in an effort to bolster the relatedness of Pennsylvania, submits the declaration of Devine, who confirms that MET is a citizen of Pennsylvania, which has been headquartered in Lebanon, Pennsylvania for at least thirty-five years and employs approximately forty-five employees, of which thirty-five work at MET's corporate headquarters in Lebanon. *Doc. 10-2* at 2, ¶¶ 2-3.  Thus, we cannot conclude, as Selip has, that Pennsylvania

is an unrelated forum.  Moreover, Pennsylvania has an interest in providing its citizens with a remedy when they are harmed through the sale of a deficiently designed and manufactured product.  For those same reasons, it is appropriate for a Pennsylvania jury to sit for this case.  Therefore, Pennsylvania is not an unrelated forum, and its citizens would not be burdened with jury duty.  Accordingly, the fifth relevant factor also does not support dismissal.

In drawing the private and public interest factors to a conclusion, we find that the balance of these factors does not overcome the presumption of convenience that exists in favor of MET.[3]  Accordingly, we will not dismiss this action based on *forum non conveniens* grounds.

### B. Selip's Motion Under Rule 12(b)(6) of the Federal Rules of Civil Procedure Should be Granted.[4]

#### 1. Rule 12(b)(6) Standard.

In accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court may dismiss a complaint  for "failure to state a claim upon which relief

---

[3] Notably, the *forum non conveniens* determination "is committed to the sound discretion of the trial court," and "[i]t may be reversed only when there has been a clear abuse of discretion[.]"  *Piper*, 454 U.S. at 257 (citing *Gulf Oil Corp.*, 330 U.S. at 511-512).  Thus, "where the court has considered all relevant public and private interest factors, and where its balancing of these factors is reasonable, its decision deserves substantial deference."  *Id.* (citing *id.*)

[4] *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S.Ct. 568, 580 n.4, 187 L. Ed. 2d 487 (2013) (distinguishing between a motion under Rule 12(b)(6) and a motion under the *forum non conveniens* doctrine).

can be granted."   When reviewing a motion to dismiss, "[w]e must accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff, and ultimately determine whether plaintiff may be entitled to relief under any reasonable reading of the complaint." *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010).   In making that determination, we "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the [plaintiff's] claims are based upon these documents." *Id.* at 230.

"A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirements of Rule 8(a)." *I.H. ex rel. D.S. v. Cumberland Valley Sch. Dist.*, 842 F. Supp. 2d 762, 769-70 (M.D. Pa. 2012).   "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009).   The statement required by Rule 8(a)(2) must give the defendant fair notice of what the plaintiff's claim is and of the grounds upon which it rests. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).   Detailed factual allegations are not required, but more is required than labels, conclusions, and a formulaic recitation of the elements of a cause of action. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).   "In other words, a complaint must do more than allege the

plaintiff's entitlement to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).  "A complaint has to "show" such an entitlement with its facts." *Id.*

In considering whether a complaint fails to state a claim upon which relief can be granted, the court must accept as true all well-pleaded factual allegations in the complaint, and all reasonable inferences that can be drawn from the complaint must be construed in the light most favorable to the plaintiff. *Jordan v. Fox Rothschild, O'Brien & Frankel, Inc.*, 20 F.3d 1250, 1261 (3d Cir. 1994).  But a court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).  Additionally, a court need not "assume that a . . . plaintiff can prove facts that the . . . plaintiff has not alleged." *Associated Gen. Contractors of Cal. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983).

Following *Twombly* and *Iqbal,* a well-pleaded complaint must contain more than mere legal labels and conclusions.  Rather, it must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation.  In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis:

> First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'  Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'  Finally, 'where there are well-pleaded factual allegations, a court should assume their

> veracity and then determine whether they plausibly give rise to
> an entitlement for relief.'

*Santiago v. Warminster Tp.*, 629 F.3d 121, 130 (3d Cir. 2010) (quoting *Iqbal*, 556
U.S. at 675 & 679).

### 2. Count I of the Complaint—Strict Liability.

In Count I of the complaint, MET alleges that Selip is strictly liable for the
manufacturing defect in the FRP piping for the following reasons: (a) the piping
was "defective when it left Selip's facility because it was not manufactured in
accordance with the parties' contract, Selip's working procedures, the project's
design specifications, and all [of MET's] approved drawings"; and (b) the piping
"failed to include woven roving layers in the piping's flanges, the piping's flange
construction was not made integrally as one piece on a mold, and it was poorly
bonded." *Doc. 1* at 9, ¶¶ 39-40. In response, Selip argues that the economic loss
doctrine bars MET's claim for strict liability—manufacturing defect. *Doc. 7* at 25-
26.

As originally developed under Pennsylvania law, "the economic loss
doctrine provided that no cause of action could be maintained in tort for negligence
or strict liability where the only injury was 'economic loss'—that is, loss that is
neither physical injury nor damage to tangible property." *2-J Corp. v. Tice*, 126
F.3d 539, 541 (3d Cir. 1997) (collecting Pennsylvania cases). Thus, "[t]he
quintessential form of economic loss [was] lost profits." *Baloise Ins. Co. v.*

*Harring*, No. 4:CV 06-0192, 2006 WL 1310792, at *2 (M.D. Pa. 2006) (citing *2-J Corp.*, 126 F.3d at 542).

The Supreme Court of the United States, in *East River Steamship Corp. v. Transamerica Delaval, Inc*., 476 U.S. 858 (1986), expanded the doctrine by precluding recovery in tort for what is clearly damage to the product itself. *2-J Corp.*, 126 F.3d at 542 (citing *Saratoga Fishing Co. v. J.M. Martinac & Co*., 520 U.S. 875, 879 (1997)). Thus, recovery in tort for the cost of replacing the damaged product is unavailable; recovery of such costs rests properly in warranty law rather than tort law. *Rice v. Electrolux Home Products, Inc.*, No. 4:15-CV-00371, 2015 WL 4545520, at *4 (M.D. Pa. 2015).

The United States Court of Appeals for the Third Circuit and the Pennsylvania Superior Court have predicted that the Pennsylvania Supreme Court will adopt the *East River* holding. *See, e.g*., *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618–21 (3d Cir. 1995); *REM Coal Co., Inc. v. Clark Equip. Co.*, 563 A.2d 128, 132 (1989) ("*REM Coal*"). As such, the intermediate appellate courts of Pennsylvania, as well as federal courts applying Pennsylvania law, have routinely applied the principles set forth in *East River*. *Duquesne Light*, 66 F.3d at 619. In particular, an *en banc* panel of the Pennsylvania Superior Court, in *REM Coal*, "held that 'recovery in tort is barred in product liability actions between commercial enterprises where the only damage alleged is to the product

itself.'"  *Duquesne Light*, 66 F.3d at 619 (quoting *REM Coal*, 563 at 132).  The Superior Court reasoned that "contract theories such as breach of warranty are specifically aimed at and perfectly suited to providing complete redress in cases involving . . . economic losses."  *Id.* (quoting *REM Coal*, 563 at 129) (internal quotation marks omitted).

Therefore, the case law clarifies that while tort recovery is available for damage the product causes to persons or other property, such recovery is barred for damage a product causes to itself.  *Rice*, 2015 WL 4545520, at *4.  "This interpretation of the economic loss doctrine comports with the purposes behind the adoption of the doctrine in Pennsylvania," which includes "'plac[ing] a check on limitless liability for manufacturers and establish[ing] clear boundaries between tort and contract law.'"  *Id.* at *5 (quoting *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 680 (3d Cir. 2002)); *see King v. Hilton–Davis*, 855 F.2d 1047, 1051 (3d Cir. 1988) (applying Pennsylvania law) ("When loss of the benefit of a bargain is the plaintiff's sole loss . . . the undesirable consequences of affording a tort remedy in addition to a contract-based recovery [are] sufficient to outweigh the limited interest of the plaintiff in having relief beyond that provided by warranty claims.").[5]

---

[5] We briefly note that although the Pennsylvania Supreme Court had occasion to address the economic loss doctrine in *Bilt–Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270 (2005), it "simply made an exception to the

Here, Selip argues that because MET has only alleged economic losses, and not personal injury, Count I of the complaint should be dismissed on the basis of the economic loss doctrine. *Doc. 7* at 26.  In response, MET argues that Selip has ignored allegations in the complaint, which reveal that Selip's defective FRP piping caused damage to "other property"—specifically, damage to ZAP's pumping station facility and FGD Unit.[6]  *Doc. 10* at 13; *see doc. 1* at 6, ¶¶ 22-23. Despite filing a reply brief (*doc. 11*), Selip has not countered MET's assertion that the FRP piping caused damage to other property (*see id.* at 6 n.1).

Based on our review of the complaint, MET has not alleged that the FRP piping caused personal injury, but instead has alleged that it caused damage to

---

doctrine," which "allow[s] a commercial plaintiff recourse from an expert supplier of information with whom the plaintiff has no contractual relationship, when the plaintiff has relied on that person's special expertise and the supplier negligently misrepresents the information to another in privity." *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 177 (3d Cir. 2008) (internal quotation marks omitted) (quoting *Bilt–Rite*, 866 A.2d at 286).  *Bilt-Rite*, which was a negligent misrepresentation action, is simply not the case we have before us.

[6] In addition, MET alleges that a forced three month shutdown of ZAP's entire plant also constitutes damage to "other property." *Doc. 10* at 13; *doc. 1* at 2, ¶ 1. We, however, are not persuaded, as this is the type of damage that falls squarely within the realm of the economic loss doctrine. *See, e.g.*, *2-J Corp.*, 126 F.3d at 542 (providing that when a product purchased by a commercial entity fails to perform, disruption of that commercial entity's business, including loss of customers, sales, and profits, are losses which are economic in nature and cannot be recovered from the product's manufacturer in tort).  Moreover, and as discussed herein, this purported three month shutdown relates to the shutdown of a plant, which based on these facts, appears to be property owned by a third party—i.e., ZAP.

property other than the FRP piping itself.  In particular, MET alleges that it sent Selip photographs, which show "structural damage to ZAP's pumping station facility." *Doc. 1* at 6, ¶ 23.  MET further alleges that "[t]here was a serious malfunction on the FGD Unit[.]"  *Id.* at ¶ 22.  Despite alleging that the FRP piping caused damage to the "pumping station facility" and the "FGD Unit," MET does not allege that it owns this "other property."  In fact, based on the complaint before us, it appears that ZAP, a third party, owns both the "pumping station facility" and the "FGD Unit."  Yet, neither party has squarely addressed whether the economic loss doctrine bars recovery for damages to "other property" that is owned by a third party.  *See Ellenbogen v. PNC Bank*, 731 A.2d 175, 188 n.26 (Pa. Super. Ct. 1999) (emphasis added) (explaining that the economic loss doctrine "bar[s] a plaintiff from recovering purely economic losses suffered as a result of a defendant's negligent or otherwise tortious behavior, absent proof that the defendant's conduct caused actual physical harm to a plaintiff or *his* property"); *Moore v. Pavex, Inc.*, 514 A.2d 137, 138-140 (Pa. Super. 1986) (emphasis in original omitted) (affirming trial court's determination that "there could be no recovery for economic loss by the plaintiffs in this case who did not suffer physical harm to property in which they had a proprietary interest"); *see generally Naporano Iron & Metal Co. v. Am. Crane Corp.*, 79 F. Supp. 2d 494, 504-05 (D.N.J. 1999) (observing that "[t]here are few precedents—in New Jersey or

elsewhere—addressing whether a party may assert a products liability claim for third-party damage that accompanies injury to the defective product itself" and that "[t]his dearth of case law likely reflects the fact that few plaintiffs would have standing to assert a claim for damages to the property of another, not the novelty of this question" and concluding, therefore, that the plaintiff was "not permit[ted] tort recovery for economic loss when the 'other property' harmed is not that of the plaintiff").   Furthermore, even if MET had alleged that it owns the "pumping station facility" and the "FGD Unit," MET has only sought recovery for (1) "the replacement pipes" and (2) "other services." *Doc. 1* at ¶ 36; *see REM Coal*, 563 A.2d at 133 (emphasis added) (explaining that the "proper focus" of our inquiry is "on the actual harm for which plaintiff seeks *recovery*").   As such, we treat the complaint as solely seeking recovery for damages to the FRP piping, damages which are clearly barred under the economic loss doctrine.[7]   Accordingly, the issue of whether the damage to the "pumping station facility" and the "FGD Unit" constitute damage to "other property," recovery for which is not barred under the economic loss doctrine, is merely an academic argument at this point.   We will

---

[7] While MET also seeks recovery for "other services [it] was forced to render as a result of Selip's defective FRP piping," *doc. 1* at ¶ 36, MET has not argued that these services constitute "other property."  *See doc. 10* at 13-14.

therefore grant Selip's 12(b)(6) motion to dismiss Count I of the complaint.[8] Because we are unable to make a certain determination as to whether amending the complaint would be inequitable or futile, however, we will allow MET the opportunity to amend its complaint should the circumstances so warrant. *Phillips v. County of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008) ("[I]f a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile.").

## IV. Conclusion.

For all of the foregoing reasons, Selip's motion (*doc. 6*) to dismiss under the doctrine of *forum non conveniens* will be denied; however, Selip's motion (*doc. 6*) to dismiss under Rule 12(b)(6) will be granted with respect to Count I of the complaint. An implementing order follows, giving MET 28 days therefrom to file an amended complaint.

*S/Susan E. Schwab*
Susan E. Schwab
United States Magistrate Judge

---

[8] Given our finding with respect to the economic loss doctrine, we need not address Selip's contention that the gist of the action doctrine and *Tincher v. Omega Flex, Inc.*, 104 A.3d 328 (Pa. 2014) also mandate dismissal of MET's strict liability claim.

27