# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARSULEX ENVIRONMENTAL TECHNOLOGIES, | : | CIVIL NO.: 1:15-CV-00269 |
| | : | |
| Plaintiff, | : | |
| v. | : | (Chief Magistrate Judge Schwab) |
| | : | |
| SELIP S.P.A., | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM
March 27, 2017

## I. Introduction.

Plaintiff Marsulex Environmental Technologies ("MET"), a Delaware Corporation with its principal place of business in Lebanon, Pennsylvania, brings this diversity action for strict liability, breach of contract, breach of express and implied warranties, and unjust enrichment against Defendant Selip S.P.A. ("Selip"), an Italian corporation with its principal place of business in Fontanellato (Parma), Italy.  MET, who is now proceeding *via* an amended complaint, maintains that Selip deficiently designed and manufactured piping that was supplied to one of MET's customers in Poland.  Before the Court is Selip's motion to dismiss the entire amended complaint on the basis that a provision in the parties' agreement

precludes MET from raising the claims therein.[1]  In the alternative, Selip moves to dismiss Count I of the amended complaint, a strict liability claim, on the basis that it is barred by Pennsylvania's economic loss doctrine.  For the reasons set forth below, Selip's motion will be granted in part and denied in part.

## II. Background and Procedural History.

On February 6, 2015, MET filed an original complaint (*doc. 1*) against Selip, alleging that Selip deficiently designed and manufactured piping that was supplied to one of MET's customers in Poland.  In lieu of an answer, Selip filed a motion (*doc. 6*) to dismiss MET's original complaint under the doctrine of *forum non conveniens*, insisting that this action could not proceed fairly in the Middle District of Pennsylvania, and that instead, it should be litigated in Poland.  In the alternative, Selip moved under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Count I, alleging strict liability.  Selip argued, among other things, that Count I was barred by Pennsylvania's economic loss doctrine.

On March 18, 2016, the Court ruled on Selip's motion to dismiss.  *See docs. 28, 29.*  The motion was denied under the doctrine of *forum non conveniens*, but

---

[1] The parties' agreement appears to be comprised of the following documents, all of which are attached to the amended complaint: (1) "Specification for Absorber External FRP Recycle Piping for Zaklady Azotowe 'Pulawy' S.A. Pulawy, Poland" (*doc. 33-1* at 2-16); (2) "Supplementary Terms and Conditions for Zaklady Azotowe 'Pulawy' [P]roject[,] Pulawy, Poland" (*doc. 33-2* at 2-5); and (3) "Purchase Order Terms and Conditions" (*doc. 33-3* at 2-8).  For ease of reference, we will simply refer hereinafter to these documents as the "Contract."

granted under Rule 12(b)(6) to dismiss Count I pursuant to Pennsylvania's economic loss doctrine.  Having so ruled, the Court instructed MET to file an amended complaint.  MET filed that amended complaint (*doc. 33*) on April 15, 2016, raising (as it did before) claims of strict liability, breach of contract, breach of express warranty, breach of implied warranty, and unjust enrichment due to Selip's allegedly deficient design and manufacturing of the piping that was supplied to MET's customer in Poland.

Since the filing of the amended complaint, Selip has filed its second motion (*doc. 42*) to dismiss.  This time, Selip moves for dismissal of the entire amended complaint on the basis of a provision in the parties' Contract.  In the alternative, however, Selip moves for dismissal of Count I in the amended complaint, a strict liability claim.  Selip, who also moved for dismissal of Count I in its first motion to dismiss, resurrects its argument here and maintains that MET's strict liability claim is barred by Pennsylvania's economic loss doctrine.

### III. The Amended Complaint.

In order to once again evaluate the adequacy of MET's pleadings, we briefly state the facts, as set forth in the amended complaint, as follows:[2]

On or about January 22, 2010, MET, a company which provides air quality control systems to minimize the emission of air pollutants, entered into an engineering and procurement agreement with Zaklady Azotowe "Pulway" S.A. (hereinafter, "ZAP"), a chemical company in Poland, which specializes in the manufacturing of fertilizer. *Doc. 33* at ¶¶ 8, 9. This agreement, in part, required MET to oversee the design and purchase of goods for the construction of a Flue Gas Desulfurization Unit ("FGD Unit" or "Unit") at ZAP's chemical plant in Poland. *Id.* at ¶ 10. According to MET, the environment inside an FGD Unit is highly corrosive, and based on past experience, MET determined that the FGD Unit required "External Fiberglass Reinforced Plastic Piping" ("FRP piping" or "piping").[3] *Id.* at ¶¶ 1, 11.

---

[2] In accordance with the standard of review for a Rule 12(b)(6) motion, we will not only "accept all factual allegations in the [amended] complaint as true," but we will also "construe the [amended] complaint in the light favorable to the plaintiff[.]" *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010).

[3] In the original complaint, the piping was referred to as "Fiberglass Reinforced Recycle Piping." *See doc. 1* at ¶ 1. In the amended complaint, however, the piping is referred to as "External Fiberglass Reinforced *Plastic* Piping." *See doc. 33* at ¶ 1 (emphasis added). For ease of reference, we will simply refer hereinafter to the piping as the "FRP piping" or "piping."

On or about June 21, 2010, MET entered into a Contract with Selip, under which Selip agreed to design, manufacture, and supply FRP piping for the construction of the FGD Unit at ZAP's chemical plant.[4]   *Id.* at ¶ 12.   This Contract required Selip to, among other things, fabricate the FRP piping in accordance with Selip's recommended procedures and all approved drawings.  *Id.* at ¶ 14.  This Contract further required the inner and outer surfaces of the FRP piping to be "free of cracks."   *Id.* at ¶ 15 (quoting *doc. 33-1* at 9, ¶ 4.4).   In addition, Selip warranted that the contracted-for equipment would be "properly and professionally constructed;" it would "meet the technical requirements of the Purchase Order[,] including the standards and regulations[,] as well as the best engineering practices;" and it would be "new and unused, of the specified material, free of defects, and fit for the application specified."   *Id.* at ¶ 16 (quoting *doc. 33-2* at 3, ¶ 5).  Selip further warranted that the FRP piping would be "of merchantable quality, free from all defects in design, workmanship and materials, and . . . fit for the particular purposes for which they [were] purchased," and finally, "provided in strict accordance with the specification, samples, drawings, designs or other requirements (including performance specification) approved or adopted by [MET]."  *Id.* at ¶ 17 (quoting *doc. 33-3* at 4, ¶ 10 (b)).

---

[4]At all times, Selip was aware that the FRP piping would be used in the construction of a FGD Unit at ZAP's plant. *Id.* at ¶ 13.

On or about February 3, 2011, Selip delivered the FRP piping to ZAP's plant, and in October of 2012, the plant began operating. *Id.* at ¶¶ 18, 19. Only a few months later in January of 2013, Selip was notified that there were cracks in the FRP piping. *Id.* at ¶ 20. Selip, after examining the FRP piping at ZAP's plant, acknowledged the cracks, but deemed the cracks "superficial" and filled them with resin. *Id.* According to MET, these cracks were an early warning sign that Selip's FRP piping was defective, and as was later revealed, Selip's hasty repair failed to correct the underlying problems. *Id.*

On or about September 16, 2013, Selip was notified that new cracks were forming in the FRP piping. *Id.* at ¶ 21. According to MET, the continued cracking demonstrated that the problems with the piping were significant, and further, that the piping was continuing to deteriorate. *Id.* Selip, on or about April 8, 2014, went to ZAP's plant, examined the cracking in the FRP piping, acknowledged—once again—that there were cracks in the piping, and avowed that it would provide support and assistance to repair the cracks. *Id.* at ¶ 22. According to the amended complaint, Selip, contrary to the parties' "agreement," specified that all costs for its assistance to repair its defective piping would be charged to either MET or ZAP. *Id.*

On or about May 31, 2014, there was a serious malfunction on the FGD Unit caused by the failure of the FRP Piping. *Id.* at ¶ 23. ZAP, on June 2, 2014,

6

informed MET of this failure, and MET, on the same day, informed Selip of the same. *Id.* The following day, MET sent Selip photographs of the failed FRP piping and resulting damage at ZAP's plant. *Id.* at ¶ 24. According to MET, the photographs illustrate that the FRP piping essentially exploded and tore apart, causing structural damage to ZAP's pumping station facility, which housed the FGD Unit and key components of the FGD Unit other than the FRP piping itself, such as the agitator, expansion joints, and flanges. *Id.* Thereafter, MET informed Selip of ZAP's understanding that the failure was caused by a deficiency in Selip's design and manufacturing of the FRP piping, and MET requested that Selip dispatch someone to ZAP's plant in order to examine the piping and make a determination as to why it failed. *Id.* at ¶ 25. According to MET, however, Selip refused to send someone. *Id.* at ¶ 26.

As a result of the failed FRP piping, ZAP's plant was completely shut down for approximately three months. *Id.* at ¶ 27. In addition, MET was required to repair the FGD Unit in order to comply with guarantees and performance obligations in its agreements with ZAP. *Id.* at ¶ 28. More specifically, MET was under warranty for all key equipment used in the FGD Unit. *Id.* And, in order to repair the Unit, MET was forced to replace, at its own expense, the failed FRP piping with a product from another manufacturer. *Id.* at ¶ 29. MET was also

forced to replace other various key components of the FGD Unit, also at its own expense, including the agitator, expansion joints, and flanges. *Id.*

In addition, MET hired a third-party expert (the "Expert") to investigate Selip's failed FRP piping. *Id.* at ¶ 30. The Expert evaluated cross-sections from samples of the piping, as well as the piping's construction *via* "visual inspection and a modified loss on ignition test—also referred to as a burn test." *Id.* at ¶ 31. The Expert concluded that the FRP piping supplied by Selip was poorly constructed because Selip used low strength reinforcement and non-structural components in the flange area of the piping. *Id.* at ¶ 32. The Expert further concluded that the flanges in the piping did not meet Selip's design and fabrication requirements. *Id.* In particular, the Expert's tests revealed that the woven roving layers that were required by Selip's working procedures were not used in the flange section of the FRP piping, thus resulting in weak piping, which could not handle the stress that it was intended to handle. *Id.* at ¶ 33. The Expert's tests also revealed that the FRP piping included "flange areas that had joints and were not made essentially from one piece as depicted in Selip's drawings and working procedures." *Id.* at ¶ 34. "Selip's use of flanges with joints reduced the overall flange strength because a joint crevice was located directly behind the point of high stress in the flange hub." *Id.* Finally, the testing showed instances of poor secondary bonding. *Id.* at ¶ 35.

On or about September 24, 2014, MET informed Selip that there were manufacturing defects in the FRP piping, and further, that the piping was not manufactured in accordance with the parties' contract, Selip's working procedures, or Selip's design.   *Id.* at ¶ 36.   Moreover, Selip failed to manufacture sections of the piping's flange areas in conformity with the standard industry practice because "Selip prepared the piping's flanges with a non-structural short segment of pipe placed behind the flange extending the length of the elbow rather than laying-up the flange directly onto the end of the elbow."   *Id.* at ¶ 37.   As a result, Selip's FRP piping was not fit for its intended use.   *Id.*

As a result, MET requested payment from Selip in the amount of $557,873.53 for the following: (1) replacement of (a) the defective FRP piping, (b) the agitator in the FGD Unit, and (c) the flanges in the FGD Unit; (2) repair of other components of the FGD Unit; and (3) other services that it was forced to render as a result of Selip's defective FRP piping.   *Id.* at ¶ 38.   According to the amended complaint, Selip rejected this request on or about October 29, 2014.   *Id.* at ¶ 39.

**IV. Legal Standards.**

In accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court may dismiss a complaint for "failure to state a claim upon which relief can be granted." When reviewing a motion to dismiss, "[w]e must accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff, and ultimately determine whether plaintiff may be entitled to relief under any reasonable reading of the complaint." *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010). In making that determination, we "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the [plaintiff's] claims are based upon these documents." *Id.* at 230.

"A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirements of Rule 8(a)." *I.H. ex rel. D.S. v. Cumberland Valley Sch. Dist.*, 842 F. Supp. 2d 762, 769-70 (M.D. Pa. 2012). "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). The statement required by Rule 8(a)(2) must give the defendant fair notice of what the plaintiff's claim is and of the grounds upon which it rests. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). Detailed factual allegations are not required, but more is required than labels, conclusions, and a formulaic

10

recitation of the elements of a cause of action. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "In other words, a complaint must do more than allege the plaintiff's entitlement to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009). "A complaint has to "show" such an entitlement with its facts." *Id.*

In considering whether a complaint fails to state a claim upon which relief can be granted, the court must accept as true all well-pleaded factual allegations in the complaint, and all reasonable inferences that can be drawn from the complaint must be construed in the light most favorable to the plaintiff. *Jordan v. Fox Rothschild, O'Brien & Frankel, Inc.*, 20 F.3d 1250, 1261 (3d Cir. 1994). But a court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997). Additionally, a court need not "assume that a . . . plaintiff can prove facts that the . . . plaintiff has not alleged." *Associated Gen. Contractors of Cal. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983).

Following *Twombly* and *Iqbal*, a well-pleaded complaint must contain more than mere legal labels and conclusions. Rather, it must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation. In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis:

> First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' Second, the court should identify

> allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.'

*Santiago v. Warminster Tp.*, 629 F.3d 121, 130 (3d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 675 & 679).

## V. Discussion.

### A. To the Extent that Selip Moves to Dismiss the Amended Complaint in Its Entirety, Selip's Motion will be Denied.

In its brief, Selip argues that section 27 of the terms and conditions to the parties' Contract bars all of MET's claims in this action. *See doc. 44* at 6-7. That section reads as follows:

> **27. Consequential Damages.**
>
> a) In no event shall either party be liable to the other in contract or in tort (including negligence), strict liability, indemnity or otherwise, for any indirect, special, consequential, or exemplary damages, including but not limited to loss of profit, loss of goodwill, loss of revenue, and cost of capital.
>
> b) This Article shall survive the expiration of termination of this Agreement, no matter how occasioned.

*Doc. 33-3* at 8, ¶ 27 (hereinafter, "Provision 27" or "Provision"). According to Selip, this Provision is an exculpatory clause, barring MET from pursuing its claims for breach of contract and strict liability. *Doc. 44* at 7. Taking this one step further, Selip argues that regardless of whether MET proves that the FRP piping

12

was defective or whether Selip breached the parties' agreement—both of which it expressly denies—this exculpatory clause bars MET from the recovery of any damages alleged in the amended complaint. *Id.* As such, Selip urges the Court to dismiss the amended complaint in its entirety. *Id.*

MET sharply disputes Selip's contention that Provision 27 is an exculpatory clause, granting Selip immunity from this action. *See doc. 47* at 4-7. Instead, MET argues that this Provision is nothing more than a limitation of liability clause, which, at most, precludes either party from recovering for consequential damages. *Id.* at 4-6. Further, and without specifically characterizing each item of damages it seeks, MET contends that it is seeking, "among other things, compensatory and/or incidental damages for the costs it incurred to remedy the failure of the FGD Unit and costs associated with delays caused by the defective Selip FRP piping." *Id.* at 6. Such costs, MET contends, are provided for under the parties' Contract, and in support, MET points to the "General Warranty" provision, wherein Selip agreed to reimburse MET "for all expenses, including but not limited to, material and labor costs to repair or replace malfunctioning or nonconforming goods [and] for any costs incurred for schedule delay as a result of any labor, material and/or design supplied by [Selip]" which did not conform to the parties' Contract. *Id.* (quoting *doc. 33-3* at 4, ¶ 10(c)). Thus, MET argues that because Provision 27 does not shield Selip from any and all liability, and because MET is entitled to the costs it

13

incurred *via* the parties' Contract, the Court should deny Selip's motion to dismiss the amended complaint in its entirety. *See id.* at 4-7.

At the outset, we note that because the Court is sitting in diversity, the substantive law of Pennsylvania will be applied to MET's state law claims. *See Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir. 2000) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)). In applying the substantive law of Pennsylvania, we further note that "the highest court of the state,"—and for our purposes, the Pennsylvania Supreme Court—"is the final arbiter of what is state law." *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940) (citing *Wichita Royalty Co. v. City Nat'l Bank of Wichita Falls*, 306 U.S. 103, 107 (1939)). Thus, when the Pennsylvania Supreme Court has spoken, "its pronouncement is to be accepted by federal courts as defining state law unless it has later given clear and persuasive indication that its pronouncement will be modified, limited, or restricted." *West*, 311 U.S. at 236. When the Pennsylvania Supreme Court has not yet spoken, however, we are tasked "with predicting how [it] would resolve the question at issue." *Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 236 (3d Cir. 2006). In so predicting, "we must take into consideration: (1) what that court has said in related areas; (2) the decisional law of the state intermediate courts; (3) federal cases interpreting state law; and (4) decisions from other jurisdictions that have discussed the issue." *Id.*

Pennsylvania law "recognizes different methods by which a party can limit his/her exposure to damages resulting from his/her negligent performance of a contractual obligation[,]" and among those methods are exculpatory clauses and limitation of liability clauses. *See Valhal Corp. v. Sullivan Assoc., Inc*., 44 F.3d 195, 202 (3d Cir. 1995) (citing Pennsylvania cases). Exculpatory clauses immunize a party from the consequences of his or her negligence. *Id.* (citing *Topp Copy Products, Inc. v. Singletary*, 626 A.2d 98, 99 (Pa. 1993)). As such, they are generally disfavored and must meet certain conditions in order to be enforceable. *Valhal Corp.*, 44 F.3d at 202; *see also Topp Copy*, 626 A.2d at 99 (Pa. 1993) (requiring the following three conditions to be met: (1) that the clause does not contravene public policy; (2) that the contract relates to the private affairs of the contracting parties; and (3) that each party is a free bargaining agent).

In contrast, limitation of liability clauses do not immunize a party from liability; rather, they merely place a limit, or a cap, upon such liability. *Valhal Corp.*, 44 F.3d at 202. Because of that difference, limitation of liability clauses are not disfavored, especially when contained in contracts between informed business entities dealing at arm's length. *See id.* at 203-04; *see also John B. Conomos, Inc. v. Sun Co. Inc. (R&M)*, 831 A.2d 696, 704 (Pa. Super. Ct. 2003) ("The law of the Commonwealth does not disfavor limitation of liability provisions."). Limitation of liability clauses are also not held to the same stringent standards that have been

applied to exculpatory clauses.  *Valhal Corp.*, 44 F.3d at 202-03.  Thus, so long as the limitation is reasonable and not so drastic as to remove the incentive to perform with due care, Pennsylvania courts will generally uphold limitation of liability clauses.  *See id.* at 203-04 (setting forth case law to illustrate how limitation of liability clauses have been routinely enforced under the Uniform Commercial Code and routinely upheld in sales contracts of varying types, as well as in contracts that are not governed by the Uniform Commercial Code).

Here, the parties do not dispute the general enforceability of Provision 27; rather, they dispute the characterization and scope thereof.  We easily resolve their dispute by concluding that Provision 27 is a limitation of liability clause, not an exculpatory clause.  The plain language of Provision 27 does not exempt or otherwise immunize either party from the consequences of its own actions. Instead, the Provision merely limits the type of damages that the parties may recover against one another.   More specifically, the Provision, which is titled "Consequential Damages," places a cap on potential damages by barring either party from recovering for "any indirect, special, consequential or exemplary damages including but not limited to loss of profit, loss of goodwill, loss of revenue, and cost of capital" in contract, tort, strict liability, indemnity, or otherwise.  *Doc. 33-3* at 8.   Thus, we conclude that Provision 27 is a limitation of liability clause.  *See, e.g.*, *N.Y. State Elec. & Gas Corp. v. Westinghouse Elec.*

16

*Corp.*, 564 A.2d 919, 924-25 (Pa. Super. Ct. 1989) (discussing, among other things, limitation of liability clauses in the parties' agreement, which the court found, placed a limit upon the defendant's liability for loss of profits, loss of use, cost of replacement power, or any other consequential damages in tort, contract, or otherwise).   Given our conclusion, we plainly reject Selip's contention that this Provision is an exculpatory clause, barring the instant action.

Selip, having filed a reply brief, also argues in the alternative that regardless of whether Provision 27 is classified as an exculpatory clause or limitation of liability clause, it precludes MET from recovering the damages it seeks in the amended complaint.  *See doc. 48* at 1.   In support, Selip explains that even though the amended complaint does not specify the type of damages MET is seeking, MET has, nevertheless, clarified in its opposition brief that it is seeking incidental damages.[5]  *Id.* at 2 (citing *doc. 47* at 6).   According to Selip, incidental damages are normally incurred when a buyer or seller repudiates the contract or wrongfully rejects the goods, causing the other party to incur expenses, such as transporting,

---

[5] MET avers the following in its opposition brief:

> MET is seeking, among other things, compensatory and/or incidental damages for the costs it incurred to remedy the failure of the FGD Unit and costs associated with delays caused by the defective Selip FRP piping.

*Doc. 47* at 6 (citing *doc. 33* at ¶ 38) (footnote omitted).

storing, or reselling the goods. *Id.* at 2. And, as argued by Selip, MET has not alleged that the parties' agreement was repudiated or that any goods were wrongfully rejected. *Id.* at 3. As such, Selip contends that MET, who has not adequately pled a claim for incidental damages, cannot recover for the same. *Id.* Selip further contends that MET, who has conceded that Provision 27 bars claims for consequential damages, also cannot recover for consequential damages, such as replacement costs.[6] *Id.* Thus, the amended complaint, Selip maintains, should be dismissed in its entirety. *See id.* at 4.

We also reject this alternative contention, that regardless of whether Provision 27 is classified as an exculpatory clause or limitation of liability clause, it precludes MET from recovering the damages it seeks in the amended complaint. Most problematic for Selip's argument is the fact that Provision 27 does not exempt or otherwise immunize it from all liability in this action. Rather, the Provision merely places limitations on the type of damages that MET may seek against it. Further problematic is that Selip has neither classified each of the damages claimed by MET, nor articulated how such classified damages are barred

---

[6] MET avers the following in its opposition brief:

> [Provision 27] unambiguously provides for a limit on one category of potential damages—consequential damages . . . . At most, [the Provision] would bar a claim for consequential damages.

*Doc. 47* at 5-6.

by the Provision's language.  More specifically, MET avers in the amended complaint that it is seeking payment from Selip in the amount of $557,873.53 for the following: (1) replacement of (a) the defective FRP piping, (b) the agitator in the FGD Unit, and (c) the flanges in the FGD Unit; (2) repair of other components of the FGD Unit; and (3) other services that it was forced to render as a result of Selip's defective FRP piping.  *See doc. 33* at ¶ 38.  Selip, however, has not attempted to classify these items of damages or explain why each of these items falls within the scope of Provision 27's language, such that they are wholly barred from being recovered in this action.  To further illustrate this point, although Selip contends that MET has clarified in its opposition brief that it is only seeking "incidental" damages (*doc. 48* at 2 (citing *doc. 47* at 6)), a review of MET's opposition reveals that it is also seeking "compensatory" damages as well.  *See doc. 47* at 6.  Selip, however, has not addressed whether MET is barred from recovering for such compensatory damages.  Thus, we are simply not persuaded by Selip's alternative contention at this time.  Accordingly, based on the foregoing, Selip's motion to dismiss the amended complaint in its entirety will be denied.

**B. To the Extent, However, that Selip Moves to Dismiss Count I of the Amended Complaint, Selip's Motion will be Granted.**

Having determined that Provision 27 does not bar all of MET's claims in this action, we now turn to Selip's alternative argument that Count I of the amended complaint, alleging strict liability, should be dismissed. Although Selip raises several grounds in support of this argument, we need only address one of those grounds, specifically, that Count I should be dismissed because MET's strict liability claim is barred by Pennsylvania's economic loss doctrine. *Doc. 44* at 7-8. In support of this ground, Selip explains that MET, who has not claimed that the FRP piping caused any "personal injuries," has only claimed that it suffered economic losses arising from the parties' contract. *Id.* at 8.

MET counters, however, that although the economic loss doctrine bars recovery in tort for damage a product causes to itself, such recovery is available whenever a product causes personal injury or damage to "other property." *See doc. 47* at 7. MET further counters that because it is seeking damages for such "other property," the economic loss doctrine does not preclude it from recovering in tort. *See id.* at 8-9 (explaining that the allegedly defective FRP piping caused damage to "'key components of the FGD Unit . . . such as the agitator, expansion joints, and flanges.'" (quoting *doc. 33* at ¶ 24)). MET, however, does not own the "other property" to which it claims economic damages; ZAP does. *See, e.g.*, *doc. 33* at ¶¶ 9-13, 20-27. Despite this fact, MET has failed to provide any legal support or

factual analysis for the proposition that it is entitled, nevertheless, to recover in tort for economic damages arising from ZAP's damaged property.[7]

Although Selip filed a reply brief, it did not address this particular issue; instead, Selip generally argues that because MET is alleging that the FRP piping did not perform as warranted, thereby damaging the FGD Unit, MET's strict liability claim is one for failed economic expectations. *Doc. 48* at 4-5. Thus, Selip presses, MET's strict liability claim is more akin to traditional concerns of contract law than tort law, and as such, is barred by the economic loss doctrine. *Id.*

The relevant starting point for our discussion on whether Count I is, in fact, barred by Pennsylvania's economic loss doctrine is our Memorandum and accompanying Order, addressing Selip's first motion to dismiss. *See docs. 28*, *29*. In that Memorandum, we observed that MET had alleged in the original complaint that the defective FRP piping caused, not any personal injury, but damage to property other than the piping itself. *See doc. 28* at 24-25. We further observed that despite MET alleging damage to "other property," MET had not alleged that it

---

[7] In fact, the cases to which MET has heavily cited seem to suggest that it is not entitled to such recovery. *See, e.g.*, *2-J Corp.*, 126 F.3d at 542 (allowing the plaintiff, who purchased a warehouse, to recover in tort from the manufacturer of the warehouse for damage caused to *plaintiff's* inventory when the warehouse collapsed); *Saratoga Fishing Co.*, 520 U.S. at 878-85 (allowing the plaintiff, the second user and owner of a fishing vessel, which had caught fire and sunk during *plaintiff's* period of ownership, to recover in tort against the manufacturer of the vessel's hydraulic system for damage to equipment that was added to the vessel by the initial owner and user).

owns such "other property." *Id.* In support, we reiterated the allegations in the original complaint, that ZAP, MET's customer in Poland, admittedly owns the "other property." *Id.* at 25. Despite these observations, however, we explained that "neither party ha[d] squarely addressed whether the economic loss doctrine [would bar] recovery for damages to 'other property' that is owned by a third party." *Id.* (cited cases omitted). We further explained that even if MET had alleged that it owns such "other property," MET had only "sought recovery for (1) 'the replacement pipes' and (2) 'other services.'" *Id.* at 26 (quoting *doc. 1* at ¶ 36). In other words, MET had not sought recovery for damage to the "other property." As such, we found the issue of whether damage to ZAP's "other property" was recoverable by MET in tort was merely an academic argument at that point in time and dismissed Count I from the original complaint. *Id.* at 26-27. We also provided MET with the opportunity to amend its original complaint should the circumstances so warrant. *Id.* at 27.

MET, having found the circumstances so warranted, filed an amended complaint. *See doc. 33*. Although MET cured the original complaint by seeking recovery for damage to "other property,"[8] MET has only reinforced that it does

---

[8] In the amended complaint MET avers that it requested payment from Selip for "replacement of the defective FRP piping, replacement of the agitator in the FGD Unit, replacement of flanges in the FGD Unit, repair of other components of the FGD Unit, and other services MET was forced to render as a result of Selip's defective FRP piping." *Doc. 33* at ¶ 38.

not own such "other property," ZAP, its customer in Poland, does.  *See generally id*.  And, even though this issue was highlighted by the Court as problematic in its prior Memorandum, neither party has squarely addressed it in the briefing of the instant motion.  Considering, however, that MET now seeks recovery for damage to ZAP's "other property," we can no longer consider this issue an academic one.

As originally developed in Pennsylvania, "the economic loss doctrine provided that no cause of action could be maintained in tort for negligence or strict liability where the only injury was 'economic loss'—that is, loss that is neither physical injury nor damage to tangible property."  *2-J Corp. v. Tice*, 126 F.3d 539, 541 (3d Cir. 1997) (collecting Pennsylvania cases).  The Supreme Court of the United States, in *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858 (1986) ("*East River*"), expanded this doctrine by precluding recovery in tort for what is clearly damage to the product itself. *2-J Corp.*, 126 F.3d at 542 (citing *Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 879 (1997)). The United States Court of Appeals for the Third Circuit and the Pennsylvania Superior Court have predicted that the Pennsylvania Supreme Court will adopt this *East River* holding.  *See, e.g.*, *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618–21 (3d Cir. 1995); *REM Coal Co., Inc. v. Clark Equip. Co.*, 563 A.2d 128, 132 (1989) ("*REM Coal*").  Given this prediction, Pennsylvania's intermediate appellate courts, as well as federal courts applying Pennsylvania law,

have routinely applied the principles as set forth by the United States Supreme Court in *East River. Duquesne Light*, 66 F.3d at 619. In particular, an *en banc* panel of the Pennsylvania Superior Court, in *REM Coal*, "held that 'recovery in tort is barred in product liability actions between commercial enterprises where the only damage alleged is to the product itself.'" *Duquesne Light*, 66 F.3d at 619 (quoting *REM Coal*, 563 at 132). The Superior Court reasoned that "contract theories such as breach of warranty are specifically aimed at and perfectly suited to providing complete redress in cases involving . . . economic losses." *Id.* (quoting *REM Coal*, 563 at 129) (internal quotation marks omitted).

Thus, the case law clarifies that recovery in tort is barred for purely economic losses that occur as a result of damage to the product itself; recovery in tort is not barred, however, for "economic loss that occurs as a result of personal injury or damage to 'other property[.]'" *See Rice*, 2015 WL 4545520, at *4. "This interpretation of the economic loss doctrine comports with the purposes behind the adoption of the doctrine in Pennsylvania." *Id.* at *5 (quoting *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 680 (3d Cir. 2002)). As explained by the Pennsylvania Superior Court in *REM Coal*:

> The public policy that spawned tort recovery in the product liability context was a desire to provide protection of the public from unsafe products beyond that provided by contract law. Tort product liability theories impose responsibility on the supplier of a defective product whenever it causes personal injury or damage to other property because this is deemed to be the best way to allocate the

risk of unsafe products and to encourage safer manufacture and design. Where a product malfunctions in a manner that does not cause damage outside of the product itself, many courts have found that this public policy is not involved because contract theories such as breach of warranty are specifically aimed at and perfectly suited to providing complete redress in cases involving such economic losses. All of such losses are based upon and flow from the purchaser's loss of the benefit of his bargain and his disappointed expectations as to the product he purchased. Thus, the harm sought to be redressed is precisely that which a warranty action does redress. *See Seely, supra; East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986).

*REM Coal*, 563 A.2d at 404.

With these standards in mind, we turn to the core of the parties' present dispute: whether Count I is barred by Pennsylvania's economic loss doctrine. Normally, at this stage of the litigation, such an inquiry would be relatively straightforward.   First, we would define the product and preclude MET from recovering in tort for what is clearly damage to the product itself.  Then, we would determine if there was any personal injury or damage to "other property" (that is, property other than the product itself), for which MET would not be precluded from recovering in tort.

In this case, the product is the FRP piping; thus, MET is precluded from recovering in tort for economic damages as a result of injury to that piping itself. *See East River*, 476 U.S. at 871 ("[A] manufacturer in a commercial relationship has no duty under either negligence or strict products-liability theory to prevent a

product from injuring itself.") (footnote omitted); *see generally Electrolux Home Products*, 2015 WL 4545520 at *6 ("Consequently, any claim for economic damages related to the costs to repair or replace the allegedly defective [product] is dismissed from the complaint."). Further, while MET has not alleged any personal injury, it has alleged and seeks recovery for economic damages as a result of injury to "other property," that is, injury to the components of the FGD Unit. MET's attempt to avail itself of this "other property" exception, however, has been complicated by the fact that MET does not own the "other property" to which it is claiming such economic damages. Rather, as MET acknowledges, all of the "other property" that was allegedly damaged by the defective piping is owned by ZAP, a third party to this lawsuit.

There is no controlling decision by the Pennsylvania Supreme Court on the issue presented in this case, that is, whether a plaintiff may avoid the application of the economic loss doctrine by supplementing its claims for economic damages with allegations of third-party property damage. In the absence of such a decision, we are tasked with predicting how the Pennsylvania Supreme Court would decide this issue.

Although there is scant Pennsylvania appellate law available to guide our prediction, the Pennsylvania Superior Court has suggested that the "other property" exception to the economic loss doctrine necessarily entails that the "other

property" allegedly damaged is the plaintiff's property, not a third party's property. *See, e.g.*, *Ellenbogen v. PNC Bank*, 731 A.2d 175, 188 n.26 (Pa. Super. Ct. 1999) (explaining that the economic loss doctrine "bar[s] a plaintiff from recovering purely economic losses suffered as a result of a defendant's negligent or otherwise tortious behavior, absent proof that the defendant's conduct caused actual physical harm to a plaintiff or *his* property") (emphasis added); *Moore v. Pavex, Inc*., 514 A.2d 137, 138-140 (Pa. Super. 1986) (affirming trial court's determination that "there could be no recovery for economic loss by the plaintiffs in this case who did not suffer physical harm to property in which they had a proprietary interest") (emphasis in original omitted).[9]

Considering the dearth of Pennsylvania case law on this issue, we have also looked to how courts from other jurisdictions are handling analogous situations. These courts, in rejecting similar attempts made by plaintiffs, recognize the general rule that few plaintiffs would have standing to bring a claim for property damages on behalf of another.   *See, e.g.*, *Wausau Tile, Inc. v. Cty. Concrete Corp*., 593 N.W.2d 445, 454-55 (1999) (finding, under Wisconsin law, that plaintiff-

---

[9] At least one Pennsylvania Court of Common Pleas, when applying Kentucky law, has suggested that regardless of whether the plaintiff owned all of the "other property" at the time of the product's failure, the plaintiff could recover for "anything" other than the product itself. *Teledyne Techs. Inc. v. Freedom Forge Corp.*, No. 3398 MAYTERM 2000, 2002 WL 748898, at *1, *16 n.22 (Pa. Com. Pl. Apr. 19, 2002).  We do not find, however, this case to be persuasive.  The court plainly failed to address the issue of standing or why a plaintiff would otherwise be permitted to recover in tort for property damage on behalf of another.

manufacturer of concrete paving blocks could not escape the economic loss doctrine and recover in tort against defendant-supplier of defective cement for the cost of claims asserted against it by third-party owners of property damaged by the concrete paving blocks, even though plaintiff-manufacturer had expended funds to remedy the cost of those third-party owners' claims); *Naporano Iron & Metal Co. v. Am. Crane Corp.*, 79 F. Supp. 2d 494, 504-05 (D.N.J. 1999) (explaining that there are few precedents that address whether a plaintiff may assert a products liability claim for third-party damage that accompanies injury to the defective product itself, and that the lack of case law reflects the fact that few plaintiffs would have standing to assert a claim for property damages on behalf of another; and concluding, under New Jersey law, that the plaintiff could not recover in tort against the manufacturer of a defective crane because the damage to property other than the crane itself did not belong to the plaintiff); *Pycsa Panama, S.A. v. Tensar Earth Techs., Inc.*, 625 F. Supp. 2d 1198, 1247 (S.D. Fla. 2008), *aff'd*, 329 F. App'x 257 (11th Cir. 2009) (observing, under Florida law, that a pre-requisite to claiming damage to "other property" under the economic loss doctrine is that the plaintiff must be the owner of the other damaged property, and recognizing that this pre-requisite is consistent with the general rule that a party only has standing to bring a claim when it has personally suffered an injury); *In re MI Windows & Doors, Inc. Prod. Liab. Litig.*, No. 2:12-CV-01297-DCN, 2012 WL 5384922, at *2

(D.S.C. Nov. 1, 2012) (holding, under South Carolina law, that the plaintiff did not have standing to claim injuries from the defendant's sale of defective windows for economic losses to the windows themselves or to the adjoining finishes, walls, and other property in the homes where the windows were installed, because such injuries arose after the windows were installed in those homes and ownership changed hands); *Am. Eagle Ins. Co. v. United Techs. Corp.*, 48 F.3d 142, 145 (5th Cir.), *reh'g granted on other grounds*, 51 F.3d 468 (5th Cir. 1995) (holding, under Texas law, that owners of an airplane could not recover in tort from the manufacturer of the defective engine in that airplane, because the damage to the "other property" (i.e., the ground where the airplane crashed) was owned by a third party; so holding, even though the owner of the airplane subsequently became legally responsible for the damage to the third party's "other property"); *see also Ensign United States Drilling, Inc. v. Weatherford U.S. Ltd. P'ship*, No. 13-CV-00724-LTB, 2015 WL 4512320, at *4 (D. Colo. July 27, 2015) (applying California law, and holding that the plaintiff did not have standing to claim injuries from the manufacturer of a defective "RH-35 rod hook" for economic losses suffered as a result of personal injury to a third party (i.e., the plaintiff's employee), even though the plaintiff incurred increased workers' compensation premiums and lost profits).

In addition to looking at how courts from other jurisdictions have handled this issue, we have also reviewed leading treatises.  In particular, section 21 of the Restatement (Third)[10] provides:

> **§ 21.** Definition of "Harm to Persons or Property": Recovery for Economic Loss.
>
> For purposes of this Restatement, harm to persons or property includes economic loss if caused by harm to:
>
> (a) the plaintiff's person; or
>
> (b) the person of another when harm to the other interferes with an interest of the plaintiff protected by tort law; or
>
> (c) the *plaintiff's* property other than the defective product itself.

RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 21 (1998) (emphasis added).  Thus, section 21 suggests that harm to property includes economic loss if caused by harm to the "plaintiff's" property, not a third party's property.

Comment *f* to section 21 further provides that:

---

[10]  We firmly understand that "Pennsylvania remains a Second Restatement jurisdiction[.]" *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 399 (2014).   We only set forth language from the Third Restatement in an effort to more clearly explain the legal principles underpinning the economic loss doctrine.  *See id.* at 400 (observing that "[a]n effective and valuable restatement of the law offers instead a pithy articulation of a principle of law which, in many cases, including novel or difficult ones, represents a starting template for members of the judiciary, whose duty is then to employ an educated, candid, and common-sense approach to ensure dispensation of justice to the citizenry.")

> When a defective product causes harm to property *owned by third persons*, the contractual agreements between the parties should not shield the seller from liability to the *third party*.

RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 21, cmt. f (1998) (emphasis added).   Thus, comment *f* suggests that when third-party property is injured, it is the third party who brings such claims against the seller of the defective product.   And, as explained by the Restatement, contracts should not shield that seller from liability to the third party.   Thus, the Restatement also conflicts with a plaintiff's attempt to recover in tort, under a theory of strict liability, for economic losses arising from damage to third-party property.

Accordingly, based upon current Pennsylvania law, analogous jurisprudence from other jurisdictions, and the express language in the Restatement, we predict that the Pennsylvania Supreme Court would not allow MET to avoid the application of the economic loss doctrine by merely supplementing its claims for economic damages with allegations of third-party property damage.   In particular, we find that all of the property that was allegedly damaged is owned by ZAP, a third party to this lawsuit.   Because ZAP, as the injured third party, may bring its own strict products liability action against Selip, recovery for property damage by MET would not save Selip from further harassment for the same harm.   Thus, we find that it is ZAP, not MET, who has sufficient standing to recover in tort for such property damage.   *See Midland Builders, Inc. v. Semling-Menke Co.*, 703 N.W.2d

383 (Wis. Ct. App. 2005) ("[T]to the extent an integrated system produced and sold by a manufacturer has become someone else's property, the manufacturer ordinarily will lack standing to initiate an action in tort against one of its component suppliers for damage to the system or to property other than the system, in part because the manufacturer no longer owns the damaged system." (citing *Wausau Tile*, 593 N.W.2d at 453)).

Finally, we conclude that our prediction is consistent with the policy supporting Pennsylvania's economic loss doctrine—that is, to "maintain[ ] the separate spheres of the law of contract and tort." *N.Y. State Elec. & Gas Corp. v. Westinghouse Elec. Corp.*, 564 A.2d 919, 925 (Pa. Super. Ct. 1989). MET, who has not alleged personal injury or damage to its property, has only alleged that the failed FRP piping forced the shutdown of ZAP's plant for three months, caused damage to MET's reputation in the air pollutant control industry, and ultimately resulted in a significant financial loss to MET, who had an obligation to repair and replace ZAP's damaged property. *Doc. 33* at ¶ 1. Taking these allegations as true, as we must, it is our view that contract law, and warranty law in particular, is well-suited for commercial controversies of this sort. Specifically, we find that such economic losses are "based upon and flow from the purchaser's loss of the benefit of his bargain and his disappointed expectations as to the product he purchased. Thus, the harm sought to be redressed is precisely that which a warranty action

does redress." *REM Coal*, 563 A.2d at 404. This policy applies with particular force to this case, where MET, a sophisticated commercial entity, evidently did foresee the risk that Selip's FRP piping might prove defective because it attempted to allocate that risk contractually with Selip. Although, perhaps in hindsight, MET could have more fully or carefully allocated that risk, MET cannot now resort to Pennsylvania tort law in order to recoup benefits, for which it may not have bargained with Selip.[11]

## VI. Conclusion.

Based on the foregoing, we will grant in part and deny in part Selip's motion to dismiss. To the extent that Selip argues that a provision in the parties' Contract precludes MET from raising the claims in the amended complaint, we will deny the motion. To the extent, however, that Selip argues that Count I of the amended complaint, a strict liability claim, should be dismissed on the basis of Pennsylvania's economic loss doctrine, we will grant the motion.

An implementing order follows.

*S/Susan E. Schwab*
Susan E. Schwab
United States Chief Magistrate Judge

---

[11] We do not consider, at this time, whether the "General Warranty" encompasses MET's alleged damages because MET's breach of contract and breach of express and implied warranty claims are still pending before the Court. *See doc. 33-3* at 4.